Mr. Wade, you're up, sir. Thank you. Your Honor, if you read our briefs, you'd think we're in two different worlds, they'd say two different things about what the facts were, but let me just tell you basically before we start out, their facts are what they're claiming about Mr. Vess having made repeated racial comments, doing it time and again. That is what the personnel manager claims witnesses told him. We took the depositions of the witnesses, and they said they did not. They told it according to two of the three witnesses. They corroborated what Mr. Vess said, which was that years ago, he had inappropriately made a comment en rigue in the presence of a black employee, Tommy White, to which he immediately responded. So there are two different versions of the facts and of what Tab Cherry, he's the man that really made the decision about what he knew. Your Honor, the best way that I've found to get a reliable look at what the facts of this And we put it in the record excerpt because we think it's so important. It's found at tab two, and it contains, importantly, it contains Mr. Vess' testimony about what this employee, Karen Ewing, this is the same employee that had been sexually harassing him for years and who got a written reprimand for sexually harassing him in 2012. It's the same employee, and it's in the record excerpt, Your Honor. It's on page 18. It's where he describes what this black employee had done to him regarding The other employee, Ewing, is that a man or is that a male or female? Ewing is a female. Female, that's what I thought. But this concerns the racial comment that she made to him. It's on page 666 of the record. It's record excerpt tab 18, and he's telling this peer review committee what she had just done to him right before he went on medical leave. I think it's important to bear in mind that he went out on medical leave in January 15, right after this racial comment by Ms. Ewing, and he wasn't there in April when all these termination decisions were being made, but anyway, he's talking about what happened right after that on page, I mean right before he went on medical leave on page 666 and discusses how there had been an argument between a white employee and a black employee, and Ms. Ewing was there as a bystander, and Mr. Vest made some comment trying to close it, shut it down or saying don't use profanity or something like that, and at that point he says Ewing got up there and said there ain't no good white man. They never made a good white man, wasn't never going to be a good white man, and he says that's a misprint. This is a tape. It says black. It's actually B-L-A-C-Q, and it's not black, but the black male that was with her was cursing him out to his face when she was making these comments. So the importance of this, Your Honor, is this was considered by management at the time to be a racial slur by a black employee. Mr. Vest described in his deposition, he didn't get into that at the hearing, but in his deposition on page 563 of the record, it's his deposition pages 89 and 90 where he said he reported it to management. The guy's name was David Hancock, and Hancock responded that's a racial slur and we're not going to tolerate it. So when they say, well, the comments aren't identical, they're not the same thing, they're not identical, well, they considered that to be a racial slur, and certainly the term NRIG would be a racial slur, so to me that's about as close to identical as you could get. The sexual comments, what she did to him sexually is also described in his deposition, but I won't try to find it. It's right in his deposition and cited in the record, but it's severe things. It's not simple things. Things like pulling his pants down in front of everybody, pulling him into her sexual area, and then Rock, who's the department manager and admitted racist, he admitted he was a racist or at least used racist terms, said that she did that to a lot of men that had gone on for years, and Vest testified that he heard her say right after he reported, at least they did give her a verbal reprimand when she did it to Vest, he heard her say, well, I don't know why you're getting on to me about it now. I've been doing it for 15 years. So we think there's plenty of evidence in the record, Your Honor, from which any reasonable fact finder could find that the whites and the blacks, on this occasion, this white employee is not being treated the same as a black employee who's doing much worse things. Your Honor, in applying, I know the whole thrust of their defense is, well, you can't show that these incidents are identical. You can't show that they're identical. I'd like to make a couple of things to show the court how the record in this case diminishes that defense. Their own policies, their own handbook treats racial harassment and sexual harassment the same. The handbook is in the record at 558, 559, 341, and 342, 333, 334, 647, 650. But importantly, defense counsel, defense counsel asked leading questions to Mr. Vest to establish that they were the same. On page 552, defense counsel has taken his deposition and she points out that they have an anti-harassment policy and it applies whether it's age, race, sex, or whatever it is. And Mr. Vest agrees with it. That's the policy. So whether it's sexual harassment or it's racial harassment, it applies whenever it is. That's on page 552 when she's questioning. And he agrees with her. It applies regardless. Now, other evidence, Your Honor, that the court, that a reasonable jury could infer that there's a racial disparity. On page 598, here's one thing that's interesting about this case. They insisted before the EEOC that we have a zero-tolerance policy for racial harassment. Zero. You do one thing and you're out. And then we were questioning Mr. Vest at his deposition, I'm sorry, not Mr. Vest, Mr. Cherry, the personnel manager, the decision-maker, who's making the decisions, and he says actually what that meant was on page 598, we had a zero-tolerance in this case because management was involved. That is that Mr. Rock, the department manager, was actually the main one using those racial epithets. But then he said that also applied to Holland, who was not in management. But then on 600, we asked him, well, does this zero-tolerance apply to blacks? And he says, well, we would have to examine the severity of it. We'd have to examine the severity of it. Your Honor, let me go back. And the reason I think this peer review thing is so important, this is before the lawyers ever got involved. So it's like we're just talking with just people about what they saw or what their impressions are of what was going on. And there are four blacks on this that sit on the peer review committee. You can see who the makeup is on page 661. There's four black people who are the, or maybe three black assembly workers who are the board members and one white member of management. But then they have three people from personnel there, but they're led by Bill Vess. Bill Vess is a decision maker. When you read it, it's clear that Mr. Vess is running the show. He starts it out and tells them what's going on. And it's also obvious from it that Mr. Vess, at this point when they're having this thing, doesn't even know exactly what the charges is. He just says he's heard rumors. And he's heard rumors about who said he'd use racial epithets. And he essentially says, I don't do that. I don't believe in it. But years ago, he went on and said, years ago, I admit that I did use the term in-read, but nothing, anything near this time. And you think from their questions that they've talked to, their whole claim is, well, we have corroboration. We have witnesses that say you repeatedly used the n-word. And they identify them as being Billy Coker, who's a white employee, and Tommy White, who's a black employee. They identify them. And so you think from reading this that these witnesses have told them that. But then when one of these peer review members starts to make statements, apparently indicating where she got her information, then Mr. Cherry, I'm reading over page 667, says that you're just to ask questions. Don't be making any statements. But you get a hint from this that these witnesses have never talked to them, that it came from a piece of paper. So we took that witness's deposition, and she confirmed her name was Dixon. On page 708 of her deposition said all we had was a paper that they gave us. You know, we didn't, it's not that they saw the witnesses. We had the paper that they gave us saying that they had been, apparently saying that these witnesses had corroborated racially biased statements. So essentially, I think three different times he told her don't be making statements during the peer hearing. So what I'm telling you is Mr. Cherry, our jury could reasonably infer, that Mr. Cherry has this group of four black peer review members there, and he's trying to make them believe that there's corroborated statements of recent racial statements by Mr. Bess, when it didn't in fact happen, because we took the depositions. We took Coker's, Coker's a white employee, and he told it almost exactly the way Mr. Bess had told it. He said it was years ago, I can't tell you when, but this is what all three of them told, Mr. Coker, Mr. White, and Mr. Bess. Years ago on some date, I can't remember, Mr. Bess came in, and he said in the presence of Mr. White, who's black, and two white employees, this job has been in read. He said the word, in read. And he immediately saw Mr. White standing there and said, I'm sorry. I didn't mean anything by that. And Mr. White is equivocal in his deposition about whether he was offended or not by that, but in the end he didn't report or anything. It's clear from the depositions that Mr. White and Mr. Bess are not friends. He's not slanting it because he'd accused Mr. Bess of dating his girlfriend. So Mr. White is a black employee, but he's not slanting anything from Mr. Bess. He's just telling it the way he remembers it, and he said that's what happened. And then Mr. Coker said the same thing. The one employee, when they say we have corroboration that he's continuously making racial statements, the one employee is the person who wrote out the handwritten statement. It's the initial complaint. I believe his name was Hanley. He wrote out the statement, and he never gives any examples. He names Bess. Bess is listed, but he never gives any examples in the statement of Mr. Bess making a racial statement. He just handwrites it and says he was involved. And then in his deposition, when you read Hanley's deposition, counsel read to him the position statement. The deposition starts out by reading the position statement that went to the EOC, and it says that Bess had repeatedly made racist statements and then asked Hamlin, do you agree with that? And he essentially said, yes, I do. But he's impeached. He admitted he had a bad relationship with Bess. Bess goes into his deposition in detail about what a bad relationship they had and how he thought out to get him. But regardless, he couldn't give a specification. He just said, I know he's used the word, but I can't tell you when or under what circumstances or who was present. So we had two. Essentially what we have is the deposition testimony of the witnesses that are supposed to be providing this corroboration don't provide it. In fact, they corroborate Mr. Bess. And the one witness that does is somebody no fact finder would have to believe because of the animosity and then also because he never makes any claim about it until the position statement's read to him. So, Your Honor, all the facts have to be, as Your Honor knows far better than I do, has to be interpreted in light most favorable to the plaintiff. And under the plaintiff's view of the facts, when the personnel manager, Mr. Cherry, made this decision to fire Mr. Bess, he knew very well that what he's trying to claim about corroboration and racial statements by Mr. Bess is not true, that that's not what those employees told him even though he says they did. And I might say this in all fairness. When defense counsel started questioning these same witnesses on, you know, when she was doing her part of it, these two, Coker and White, they said, well, you think Mr. Bess is honest. You don't think he would just make up something you said if he didn't make it. And they agreed, yeah, that's right, he wouldn't. But he's sitting right there during the deposition, and he has the power of hiring and firing. So we have to take the first version of it, which is it was just this one statement. And it's just in no way as serious as what a black employee did to Mr. Bess. One, well, my time's up. You preserve your rebuttal. Thank you, Your Honor. Good morning. May it please the Court. My name is Kim Hodges, and I represent the Appellee in this matter, MTD Consumer Group. We are asking this court to affirm the decision of the district court granting summary judgment in MTD's favor because the district court correctly concluded that Mr. Bess failed entirely to produce evidence of similarly situated employees outside of his protected class who were treated more favorably under nearly identical circumstances at both the prima facie and the pretext stages of the McDonnell-Douglas analysis. Because the district court also found that Mr. Bess ultimately was able to state a prima facie case on another basis based on his denial of the work rule violation, it makes sense in this case to begin our analysis of comparators at the pretext stage. However, it's worth noting that Mr. Bess did not even produce sufficient evidence of similarly situated employees to satisfy the less rigorous standard of a prima facie burden, and we ultimately disagree with the district court's finding that he was able to meet the prima facie burden simply by denying that he violated a work rule. Mr. Bess's only evidence of pretext is offered through his purported comparator evidence. At the outset, it's important to note that a plaintiff's burden when using comparator evidence is more stringent at the pretext stage, and it's also important to note why that is. Mr. Bess has pled a disparate treatment case, intentional discrimination. In an intentional discrimination case, a plaintiff at all times has the burden of showing that there was a discriminatory motive for the alleged action. Of course, the McDonnell-Douglas framework gives us the framework for analyzing this at the summary judgment stage, and that framework is always directed at determining whether there is sufficient proof that the decision maker in the plaintiff's case had an actual intent to discriminate. So it's against this backdrop that the pretext analysis looks at comparator evidence, and this is a reason that it matters whether the comparator circumstances are nearly identical. For example, Mr. Bess has presented an argument that, in general, African-American employees who used racial epithets were not disciplined. Now, it's undisputed that not only were those examples of racial epithets not reported to management, more importantly, it's undisputed that the decision maker in Mr. Bess's case, Mr. Cherry, had no knowledge about those allegations. That's important because Mr. Cherry here is the alleged wrongdoer. He's the person in whose mind Mr. Bess must put a discriminatory motive. Allegations of comparable employees who engaged in this conduct that Cherry knew nothing about serves no purpose and tells us nothing about whether his stated reason for the termination, for Mr. Bess's termination, is, in fact, a pretext for race discrimination. This same principle will apply to some of Mr. Bess's other examples, Ms. Ewing, for example, with regard to Ms. Ewing's comment that, I believe it's they ain't never made a good white man. First, it's important to note that Mr. Cherry had never heard of this comment at the time that he made the decision to terminate. And, again, that's the focus point. When Mr. Cherry makes the decision to terminate, what is the knowledge that he has? The first time that it came up was at the Employee Peer Review Board when Mr. Bess was using it as an example. This is shown in the transcript of the Employee Review Board hearing. Mr. Bess is using it as an example as to why some of the employees who complained against him might have had a motive to might have had something against him. So if we're looking to decide whether intentional discrimination occurred, we're looking at what Mr. Cherry knew at the time that he terminated him. And at the time that he terminated Mr. Bess, what he knew was that he had a complaint from David Hamblin, a Caucasian employee, that he had overheard Mr. Bess and two other employees on multiple occasions use racial epithets in the workplace. He investigated that complaint, not just once, but twice, when after Mr. Cherry spoke with Mr. Bess to relay the allegations, Mr. Bess required further investigation, requested further investigation, which Mr. Cherry did. So at Mr. Bess's request, Mr. Cherry went back and spoke to other employees. He asked his employee relations manager to go behind him, a woman named Jessica Baker, to go behind him and also confirm that the statements he'd received from the witnesses were correct and accurate. And at the end of both of these investigations, at the time that he's making the decision of whether or not to terminate Mr. Bess, Mr. Cherry knows that he has allegations of multiple uses of racial epithets by Mr. Bess. Those allegations have been corroborated by the witnesses that he interviewed, some of whom he interviewed twice. He knew that Mr. Bess was not just an employee, he was a lead person in the weld shop, and it's undisputed in this case that when someone at MTD is in a lead or supervisory role, the expectations of conduct are higher. Mr. Bess admits that himself in his deposition. And Mr. Cherry knew that after both of these investigations that the evidence he had gathered showed that Mr. Bess had, on multiple occasions, used racial epithets in the workplace. Based on that and based on the fact that, in Mr. Cherry's view, MTD has no tolerance, particularly in the case of supervisors, for the use of racial epithets in the workplace, he terminated him. That's the relevant inquiry. What Mr. Wade and Mr. Bess are asking this court to do is to ignore all of that and let a jury examine whether Mr. Bess's version of events now is the same as the employee's version of events at the time they told Mr. Cherry. Ultimately, that's irrelevant. It doesn't matter what the employees say, whether what the employees told Mr. Cherry was true, if Mr. Cherry had a reasonable basis for believing that it was, and he did. That's the inquiry because it is an intentional discrimination case. Mr. Cherry did everything he could do to do a thorough investigation and to determine that the evidence he had was not only reasonable but that it was corroborated. He did a second investigation. That's the knowledge in his mind at the time that he makes the decision to terminate Mr. Cherry, and that's really the only knowledge relevant in an intentional discrimination case. For similar reasons, in order for comparators to be nearly identical, the employees need to have been similar with respect to the employer's expectations of him. Mr. Wade and Mr. Bess's interpretation of the similarly situated standard in the briefing dilutes the inquiry to the point that it completely loses its usefulness in a summary judgment context. If we're looking to determine what the ultimate question is, the ultimate question of whether intentional discrimination occurred, then, again, the only thing that matters is if the decision maker in the final analysis, Mr. Cherry, what he knew and what was in his mind. So employees who were not in the same position, who did not have the same expectations, who committed conduct that Mr. Cherry knew nothing about, who committed conduct or engaged in conduct that isn't comparable to the same offense that Mr. Bess was accused of, none of that matters. None of that weighs in, is useful in the analysis of whether ultimately intentional discrimination occurred because none of it adds any value to the question of whether Mr. Bess had a racial motivation. Excuse me, whether Mr. Cherry had a racial motivation. Mr. Cherry has to compare the employees based on the information that he has at the time that he makes the decision. I understand that Mr. Bess would like us to look at the employee review board and to look at statements that are made during the employee review board, but it's critical to note that at that point the decision to terminate has already been made. Mr. Cherry has already made his decision. So if he was going to have a racial motivation, he doesn't have the ability to go behind the employee peer review board and say, oh, no, no, just because you didn't agree with me, then he's still terminated. That's not the way the employee peer review board operates. The only thing he can do is make his decision at the time and place that it matters, and that's where the inquiry of whether intentional discrimination occurred happens. That's why in the McDonnell-Douglas framework the pretext analysis is so important, and that's why it's so important that if you're using comparators, that they are similarly situated in nearly identical circumstances. If, for example, Mr. Vest were weighing two completely different employees who reported to, excuse me, strike that, if this court were weighing two completely different employees who had engaged in different conduct under different supervisors, these are two different decision makers with two different levels of intent. Did the employee board have, they had authority to set aside Cherry's decision? Yes, Your Honor, they did. And they heard Mr. Vest say that a black woman had made a white racial slur? They did, Your Honor. So why wouldn't they have, they were put in a position of saying, well, wait a minute, we've got to treat him the same as we treat everybody else who's made racial slurs, right? They have the ability to do that. It's important, I think, Your Honor, to look at the makeup of the employee peer review board. These are non-management employees with the exception of one, and this is just a system through which the employees can decide if they think that the ultimate decision is fair. They had no authority to terminate Ms. Ewing? No, no, they did not, Your Honor. She wasn't before them, so it wasn't a review of her. They could have said, well, because you didn't, you haven't disciplined Ms. Ewing, but I guess there's no evidence that anybody knew prior to that. Exactly, exactly, Your Honor. So that information wasn't before them. And to the extent it's relevant, if you look at the actual transcript that Mr. Wade's referring to, the context in which this comes out is not Mr. Vest complaining, here's a situation where an African-American woman used a racial epithet against me. The context in which it comes out is in his discussion of why other employees might have had something against him. So he's, in other words, trying to call into question perhaps some of the statements that were made, but he's not saying here's something comparable. I don't think ultimately that matters because it wasn't before the Employee Review Board. The Employee Review Board was simply examining the question of whether Mr. Vest's termination was appropriate. So, again, Mr. Vest's use of comparators who are in a lower position than him, who didn't have the expectation of leadership and the expectations that an employer gives to a higher level employee aren't going to be comparable simply because the standard of conduct expected of them is lower. I used to work for an employer that had the expression, the higher the ladder, the closer to the door, and that's really the concept that is in play here. Any time there, and it's undisputed, Mr. Vest himself admits that as a lead person in his deposition, that as a lead person there was an expectation that he had a higher standard of conduct than the people that he supervised. That includes Ms. Ewing, that includes Tommy White, who was an African-American employee who was accused of having used a racial epithet by Mr. Vest. Again, Mr. Cherry had no knowledge of that one. It includes the other examples that Mr. Vest brings up in his briefing of people who are allegedly comparable. And, again, all of this is an interesting academic exercise, except for the fact that Mr. Cherry had no knowledge of any of them. All of this matters. The pinpoint in time that the pretext analysis occurs is at the time that Mr. Cherry makes the decision to terminate him. And at that point in time, we look at what knowledge he had, we look at whether he had a reasonable basis to conclude that the statements he received were credible, and we look at whether his ultimate decision was a reasonable one. So, again, Mr. Vest's argument is effectively asking the court to ignore the requirement that comparators be nearly identical and simply just let a jury decide if race was a motivating factor. This analysis dilutes the comparability analysis to the point that it loses its usefulness in determining whether intentional discrimination occurred at the summary judgment stage. Again, it's important to note in this case that Mr. Vest's only evidence of pretext is through the use of comparators. Summary judgment, as courts have recognized across the country, is the put-up-or-shut-up case. If he has a put-up-or-shut-up point in any piece of litigation, if Mr. Vest had other evidence that race was any sort of a motivation in his termination, then he should have brought it forward at the summary judgment stage. He didn't. He relied solely on comparability evidence, and because none of the alleged comparators are truly comparable, he's not able to meet his summary judgment burden. He's not able to demonstrate that there's pretext, and summary judgment in this case was proper. Does the record reflect why Holland's termination was overturned? Holland was a nonsupervisory employee who did go in front of the Employee Review Board. The voting is done by secret ballot, and so just through the voting, his was reduced to a three-day suspension and then returned. The reason for that, the reasoning that the Employee Review Board used is not reflected in the record. But he was white, right? Correct. Yes, Your Honor. Correct. And finally, on the pretext point, it is relevant that Mr. Vest was ultimately replaced by a Caucasian employee. When you look at the entire body of evidence that MTD is able to present in opposition to a pretext conclusion and you view it through Mr. Cherry's investigation and the reasonableness of his conclusion, the fact that Mr. Vest was ultimately replaced by a Caucasian employee and the fact that Mr. Vest has absolutely no other evidence of anything that would call into question the motivation of his termination or anything that would lend itself towards a conclusion that race was a motivating factor in his termination, then the district court's decision was proper. So unless the court has any other questions, then I will again ask the court to affirm the district court's decision granting summary judgment in favor of MTD. Thank you. It's been a pleasure. Thank you. Back to you, Mr. Waite. Your Honor, if the court please, I agree with counsel that the question is about the good faith of Vest. Did he in good faith believe there was anything more than this single comment years ago? The reason that I'm telling the court that there's a question of fact about this is so apparent from the peer review when this employee who's pointing out to him, I'm reading here from the peer review on page 671, this is employee Dixon. She's talking about where she got her information. She said he's written it on paper. Now she's referring to Cherry. She doesn't say that, but who else could it be? He wrote you a paper. He said you don't say it one time, you say it all the time. And then a few times down there's some back and forth, and then Cherry tells her, he's talking to this peer review committee who's questioning where did you get your information. He says you continue to make statements and gag. If you can't ask a question, don't talk. In other words, the personnel manager is telling that lady, or the jury could infer that this is what's going on, don't let him know about the source of this information. He went into this stuff about what these employees might have him because he assumed that they'd made these statements that Cherry had claimed they were making. But what we're saying is the jury could find that he was not acting in good faith, that he was misleading the peer review board. And, of course, it's not too late. The peer review board, according to them, has the final decision. But when the personnel, he and at least one, maybe two other members of personnel, were at the meeting and when they found out, assuming that they're right, that they found out for the first time at the peer review meeting, it's not too late for him to change his mind and say he's being racially harassed a lot more than he's racially harassing anybody. And second, testimony as I went on to Rick was he reported that incident to management, to Hancock, who said that's a racial slur. So it's in the record that that was done. As far as he knowing about the earlier sexual harassment, he gave a write-up to the lady. Of course he knew it. It's signed in the record. I believe it's on page 342. He gave her a verbal warning for sexual harassment. So he did know. The other thing I want to say, Your Honor, we have, I'm counting, five witnesses, Hamblin, Coker, Holland, Rock, White, pages 632, 625, 639, 611, 557, talk about the use of the term the N-word by the black employees all over the plant, on the assembly line, on the shop floor, in the press room, everywhere. And then he says, Well, I don't know about that. I don't know whether that's going on or not. I don't have any knowledge. Nobody's ever reported to me. Let me just give you this, Your Honor. I grew up in Mississippi. If I were to sit up here and tell the court that I didn't know George Wallace was a segregationist, I think everybody would laugh me out of the courtroom. Some things, if it's going on that much, so that everybody that's deposed knows about it, and him to just say, Well, I don't know anything about that. Nobody ever reported to me. The jury doesn't have to believe that. At some point, Your Honor, the jury should be able to decide cases, and we think this is a case that the jury ought to be able to decide the case. Let me ask you one question. They say Holland, at Vess's request, went and re-interviewed all these people. I'm sorry, Cherry took notes, re-interviewed all these people. Are you saying that the people that Cherry took notes from say, When I talked to Cherry and he was taking notes, he misrepresented what I said? I did not tell Cherry that? No, ma'am. Here's what I'm saying. Okay. No, ma'am. Let me be clear about this. I'm saying when they were asked what happened and about racial comments at the first of their depositions, it was just two of them, really, Coker and Wallace. I know you're talking about that now, but when you first stood up, you said, All these people said the only time he's ever used these people. That is true. That is true. Did those people, did the people that Cherry took detailed notes about what they told him, did they deny they ever said that to Cherry? No, ma'am. Okay. I just want to be clear. So there's no factual dispute that Cherry at least was told that Vess had used the N-word? No, ma'am, Your Honor. That's not exactly right. The question was, did he repeatedly use the N-word? He's admitted that he used the N-word years ago. Right. But they say that Cherry took notes that he'd used it just recently. Okay. Are you saying there's no, that people testified they did not tell Cherry that? No, ma'am. Here's what they said. They said what happened. They said, Have you ever used the N-word? Yes. One time, years ago. He used the term N-word. Any other times, no. That's the only time. Then when defense counsel questions them, they say, Well, no, you're not saying Mr. Cherry's a liar. If he says otherwise, if he says you said different, oh, no, we're not accusing Mr. Cherry of being a liar. Okay. I just want to be clear on that point. Yes, ma'am. So what I'm saying is that creates a question of fact as to whether they really told him that or whether he's just fabricating it. Well, how? Because they don't say they didn't tell him that. Well, they said what happened. They said the only thing that happened was we just, he only did it one time. And then – Let me ask you a question just so I can be clear. I mean, you've averted to Ms. Ewing and about this sexual misconduct, although I thought that you weren't still pursuing the sexual claim here, right? Or is this the racial claim that's still before us? Because you've referred to – Here's the reason I referred to it, Your Honor, is because I believe and I understand about the precedence on this. I believe that it's relevant because of the sexual misconduct because it's undisputed. They knew about it. Management knew about it, including Cherry writing him a letter. Their handbook says, and they got Vest to admit at depositions, we treat sex and race the same. So we think it's relevant. So in the case of this employee, Ewing, the black employee, she's a repeat offender in harassment. It's true the first one was sexual and the second one was racial, but she's a repeat offender. So – So the allegation is that this female pulled his pants down repeatedly in the workplace, and everybody knew that, and in a zero tolerance environment, nothing was done about it. Is that what you're saying? I'm not saying he repeatedly pulled her pants down. He just pulled her pants down one time. Well, you said she pulled other people's pants down. That's what I heard you say. And that's why I was wondering why you were giving us the information about the sexual harassment pieces because I thought that, you know, it was the racial piece. But I guess more to the point on that part was just, given what you said, was there a formal complaint filed by Mr. Vest about that behavior? He reported it, and then management made a formal complaint. It's in the record, I believe, at 341 and 342. About the sexual harassment that you mentioned? Yes, sir. Okay. That was just an information question for me because you continued to kind of intersperse it within your other argument about, you know, what she had allegedly done vis-à-vis other people and so forth. So I just wanted to make sure I had a clear understanding of what you were arguing. That's all. Roger. No, I appreciate your clarifying for me on the point. Roger. All right. Thank you, Mr. Wade. Thank you, Ms. Hodges. This concludes the oral arguments in this case. The case will be submitted, and we'll get it decided along with the other cases that we've heard this week. That's it. The panel will stand.